## George Brown *v.* The State.

1. CONTINUANCE. — An order of continuance being interlocutory in its nature, the court which grants it may have authority to set it aside without the consent of the accused; but, if so, it is a power which should be exercised only in exceptional cases, and such as most plainly show that there is no abuse of judicial discretion and no material injury to the accused.

2. SAME. — A first continuance was granted in a murder case, on defendant's application, because of the absence of a witness. Subsequently the witness was indicted for the same murder, and thereupon the court, without the consent of the defendant, set aside the order of continuance. Defendant then made application on account of the absence of another witness. *Held*, that this latter is to be regarded as a first application, and, being in compliance with the statute, it was error to overrule it.

3. PRACTICE. — An order placing witnesses under the rule, and the terms of such an order, are matters confided in a great measure to the discretion of the court; but that discretion should not be so exercised as to defeat the purpose of the order. For instance, attorneys should not be allowed, *ad libitum*, to confer with witnesses who are under the rule. Such conferences should be conducted in the presence of an officer.

4. SAME. — By leave of court an attorney had a conference with a witness under the rule, and, after the latter had testified, proposed to swear that the witness made to him statements contradictory of his testimony. *Held*, that the attempt to discredit the witness in this manner, and under such circumstances, was properly disallowed.

5. CHARGE OF THE COURT. — A charge should not assume the guilt of the accused, nor indicate any opinion of the court on that question.

6. VERDICT. — Judgment cannot be rendered in a murder case on a verdict which recites that the jury "find the defendant guilty, and assess his punishment at death." The statute is mandatory that the verdict must state *the degree* of murder of which the defendant is guilty.

7. TRANSCRIPT. — Clerks should note that in this case a second transcript was required by *certiorari*, because the first transcript sent up was not fastened with a tie bearing the seal of the court thereon.

APPEAL from the District Court of Montague. Tried below before the Hon. J. A. CARROLL.

The facts germane to the rulings are disclosed in the opinion.

The indictment jointly charged the appellant, his brother Andrew, J. W. Bell, and Albert Harris with the murder, in the county of Montague, of one R. S. Morrow, on September 5, 1873. The appellant alone was on trial.

Morrow resided in the same neighborhood with the parties indicted for his assassination, which was accomplished by shooting him from ambush as he, his little son, and a companion were riding along the road. There was some vague evidence of a preëxisting feud between him and the family of the appellant.

The principal witness for the state was Mrs. Lucinda Barras, a sister of George Brown, the appellant. She was about seventeen years old, and married, at the time of the trial, and about fourteen, and unmarried, when the murder

was committed, in 1873; and she and appellant then lived with their father, George Brown, Sr.

There was a public road upon which George Brown, Sr., lived, and which, at the distance of about a mile, passed his son Jesse's, and, about a quarter of a mile further on, passed the residence of the deceased, R. S. Morrow, who was commonly called Rat Morrow.

Mrs. Barras testified that, early in the day on which Morrow was killed, Jesse Brown and his wife came over to her father's, before the family had finished breakfast, and Jesse Brown told "the boys," Andy and George Brown, Jr., Alfred Harris, and Stephen Sullivan, to hurry and get through before Rat Morrow came along after his mules; and pretty soon the boys just named started off with their guns towards the place where Morrow was killed; that Jesse Brown and his wife wanted witness to go over to their house and stay with the children, and Jesse told her to take a bucket of water along for the boys; that she started about an hour after the boys had left, and took a bucket of water with her, and, when she got to where a branch crossed the road leading from her father's to Jesse Brown's, she found the boys there, lying in the branch, Sullivan and the appellant being on one side of the road, and Andy Brown and Harris on the other, each party having a gun and all having pistols; that from the talk that morning she knew they were there to kill Morrow — Jesse Brown having said that, if Morrow was not killed, the Browns could not live in that country; that she left the water with them, and went on over to Jesse Brown's, and about three o'clock in the afternoon she saw Morrow, his little boy, and a Mr. Koozier pass Jesse Brown's on horseback, going towards her father's; that they had been gone about long enough to go after Morrow's mules and return, when Koozier came back, running his horse at full speed, and went up to where Morrow lived, and directly Morrow's

wife came down the road by Jesse Brown's, cursing, and saying the Browns had killed her husband, and she would have them all killed before to-morrow night; at which the witness took fright and returned to her father's, but by a route which did not pass the place where Morrow was killed; when she got home and told what Mrs. Morrow said, her father and Andrew and Jesse Brown got on their horses and started to Montague; that the appellant was not at the house when she got back there, and she did not see him for two or three days, when she was told to carry him something to eat, back of her father's field on a branch; and several days afterwards she carried him something to eat in her brother Jesse's field; he did not come home to stay until after Mrs. Morrow had been killed and Koozier had disappeared; neither Morrow nor Koozier was armed on the day of the killing, so far as she could see.

On her cross-examination this witness said that Jesse went along with her when she carried the water to the boys, and told her he would carry the bucket back, which she had forgotten to tell in her direct examination. She left Jesse Brown with the boys, and went on to his house to stay with the children. She denied ill-will towards her brother, the appellant, or that she ever had said she hated him and would do what she could against him on account of his opposing her marriage to Sampson Barras, her husband; and also denied that she had ever said that she knew nothing against him, or that her husband knew nothing against him. She was asked, but not allowed to answer, whether she was not a witness against her brother, the appellant, in another case, wherein her husband had turned state's evidence.

Abe Wallace, for the state, testified that he was at home and heard four or five shots when Morrow was killed; that Mrs. Morrow sent him word about it, and he was the first person who got to the body. The deceased was lying on his back, dead. He had been shot in the elbows of both

arms, in the back, under the chin, and in the right shoulder. The shot under the chin passed through the mouth, powder-burning the whiskers and tearing out the tongue. The hat of the deceased was lying on the ground about seventy-five yards from the body, and at a spot where it appeared that horses or mules had broke into a run, about half-way between Jesse Brown's and old man Brown's, the father of the appellant. About eight o'clock the night before, witness met Albert Harris and the appellant in the road between Jesse Brown's and the old man's. They said they had been to the town of Montague for powder and shot, and that they were going to old man Brown's. Witness knew that there had been a difference between Morrow and the Browns.

Sampson Barras, the husband of the witness Lucinda, testified for the state that about three months before the trial he and the appellant went from old man Brown's to Jesse Brown's, and back again; that appellant showed him where Morrow was killed, but told him he must not say anything about it. The place was close to a ravine which crossed the road. That the appellant said that he and the others were sitting in the ravine, and when Morrow passed along the road they all shot; that Morrow fell, and then one of them ran up and shot him under the chin. Witness had never told any one, except the county attorney, about what the appellant had told him concerning the killing. On his cross-examination the witness said he entertained friendly feelings towards the appellant; but that " of course he had some bad feelings towards him about the killing of Morrow, after he had told him, and had at the time he told him of the killing, and ever since he has not had good feelings " towards the appellant. Witness remembered that just before the trial commenced he had a conversation in the clerk's office with one of the appellant's attorneys, and was positive that in the conversation he did not tell the attorney that all

he knew about the case was what Andy Brown had told him. A bill of exceptions shows that this witness stated that he had turned state's evidence against the appellant, in another case of murder; which statement the court excluded from the jury, on motion of the county attorney.

John Southerland, for the state, testified that, some eighteen months before the trial, the appellant showed him the place where Morrow was killed, saying there was where " one d—d thief bit the earth." Witness asked him who it was, and he said it was Rat Morrow. Witness asked him who did it, and he answered, " Me and Andy was two of the laverics," and mentioned two others, whose names witness did not remember. At the time of this conversation, witness had known the appellant about three months; that the story made quite an impression on witness' mind, but he never told any one about it until the Friday last past, when he told old man Ross that, if the prosecution knew what he knew, he expected they would have him for a witness; that on the next day he told the same thing to two other persons, and afterwards, when attached as a witness, he told the county attorney; that he did not tell of what he knew until all of the Browns were arrested and in jail, because he was afraid they or some of their friends would kill him; that the appellant showed him where he and the others were concealed in the ravine, and where the deceased was shot, and the spot where he fell. That no one was present besides witness and the appellant, and that the statements of the latter were made freely and voluntarily, and not in reply to any questions asked him.

George Howard, for the state, testified that he was the next person after Wallace in getting to the body of the deceased. His testimony added nothing to that of Wallace.

Dr. Gordon, for the state, testified that he saw and examined the body of the deceased about an hour after he was killed; that he was killed by gunshot wounds, some of

which witness thought were made with buck-shot; the shot under the chin was made with buck-shot, and the teeth and tongue were out on the whiskers; the shots in the face and in the back were mortal, and witness thought there was also a shot in the head; that the body was found in Montague county, and at the place where the killing occurred.

The defense first introduced Mrs. Adaline Brown, the wife of Jesse. She testified that she and her husband were at old man Brown's, appellant's father, the day Morrow was killed, and that she sent Lucinda Brown, now Barras, over to her house to stay with her children; she saw Lucinda when she started, and did not see her take any bucket with her.

Witness heard the guns when Morrow was killed; they were in a south-east direction. Not more than two minutes before they were fired, the appellant and Stephen Sullivan started from the house, where they had been all day, to go over to Mr. Bell's, to see their girls. They went in a north-east direction, and had not got out of sight when the guns were fired. Witness saw them just before the firing, and also after it; they had no guns. Andy Brown was close by the house when the guns were fired.

Witness saw Lucinda when she came back home; she told that Morrow was killed, which was the first information the family got of that fact. Witness had heard Lucinda say she did not know that her husband, Sampson Barras, knew anything against the appellant, and that if he swore anything against him he had been made to do so.

Mrs. Elizabeth Brown, mother of the appellant, for the defense, testified that she heard the firing when Morrow was killed, and that appellant was at the house just before it commenced; that he and Sullivan had both been sick, and were still puny, but had been talking of going over to old man Bell's. Andrew Brown was just coming to the house as the firing commenced; had been sent to hunt a horse, and was

returning, and about 300 yards off. The appellant and Sullivan had gone, but were not out of sight; they went north-east, and the firing was south-east. Lucinda came running, and said that Morrow was killed and that Mrs. Morrow said the Browns had killed him; and then the old man and Jesse and Andy got on their horses and started to Montague.

On cross-examination this witness said that her son George, the appellant, did not come back home, but lay out to keep from being tried for killing Morrow; he did not come home to stay until after Mrs. Morrow was killed; his reason for staying out was that he was too poor to employ lawyers to defend him on the charge of killing Morrow. It appears by the testimony of both this witness and the preceding one that, shortly after the murder, an examining court tried Andrew Brown as a party engaged in it, and that he did not have either of these witnesses to testify in his behalf.

Nanny Hart, for the defense, testified that she heard Mrs. Lucinda Barras, since her marriage, say that she hated her brother George, the appellant, and would do all she could against him. This witness was a sister-in-law of Andy Brown, one of the defendants jointly indicted with the appellant.

Mrs. Addington, for the defense, testified that she had heard Lucinda Barras say she hated the appellant; that he had opposed her marriage with Sampson Barras, and should never come about her when she moved to herself. The witness was the mother-in-law of Jesse Brown, a brother of the appellant.

Mrs. Bity Brown, wife of Andy Brown, one of the defendants in the indictment, for the defense, testified that she heard Lucinda Barras say she would do anything against the appellant, and that she wished he was dead and in hell; and, since the arrest of the appellant, witness

had heard Mrs. Barras say, if Sampson Barras had sworn anything against the appellant, Dave Price and George Howard made him do it.

This witness was at old man Brown's the day Morrow was killed, and gave substantially the same account of the parties accused as that given by her mother-in-law and Mrs. Adaline Brown.

J. H. Bogges and Dr. William Crump, for the defense, stated that they knew the reputation of Sampson Barras among his neighbors for truth and veracity; and that it was bad.

By bill of exceptions it appears that the appellant proposed to prove by one of his attorneys that Sampson Barras, just previous to the trial, told the attorney that he knew nothing about the case except what Andrew Brown had told him. The court disallowed this proof, because the attorney's conversation with Barras was held by leave of the court, while Barras was under the rule.

The jury returned a general verdict of guilty, and assessed the penalty of death; but their verdict failed to show the degree of murder of which they found the appellant guilty.

It may interest clerks to be informed that in this case the court, on motion of the assistant attorney general, required the clerk to make out and send up a second transcript of a very voluminous record, because he had failed to fasten the first one with a tie, and place the seal of the court over the tie.

*Hardy, Jameson & Shoemaker*, for the appellant. Our Code has it: " Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being within this state, with malice aforethought, either express or implied, shall be deemed guilty of murder," etc. Pasc. Dig., art. 2266. Again: " An accomplice is one who is not present at the commission of an offense, but who, be-

fore the act is done, advises, commands or encourages
another to commit the offense, or who agrees with the prin-
cipal offender to aid him in committing the offense, though
he may not have given such aid, or who promises any re-
ward, favor, or other inducement, or who prepares arms, *or
aid of any kind*, prior to the commission of an offense, for
the purpose of assisting the principal in the execution of the
same.'' Pasc. Dig., art. 1814. And by article 1818 it is
provided that, '' if the principal in an offense less than capi-
tal be under the age of seventeen years, the punishment of
an accomplice shall be increased, so as not to exceed, how-
ever, double the penalty affixed to the offense in ordinary
cases.'' And by article 1819 : '' If the accomplice stands in
the relationship of *parent, master, guardian, or husband* to
the principal offender, he shall, in all such cases, receive the
highest punishment annexed to the offense, and the same
may, in felonies less than capital, be increased by the jury
to double the highest penalty which would be suffered in
ordinary cases.'' By article 1638 : '' No person shall, in any
case, be convicted of any offense committed before he was of
the age of nine years, nor of any offense committed between
the years of nine and thirteen, unless it shall appear by
proof that he had discretion sufficient to understand the
nature and illegality of the act constituting the offense.''
And by article 1639 : '' A person, for an offense committed
before he arrived at the age of seventeen years, shall in no
case be punished with death ; but may, according to the na-
ture and degree of the offense, be punished by imprison-
ment for life, or receive any of the other punishments affixed
in this Code to the offense of which he is guilty.''

Mrs. Barras is of '' sound memory and discretion,'' else
she could not have remembered what had taken place '' three
years ago.'' She was over the age of '' nine years,'' and
not '' between the years of nine and thirteen,'' but over
thirteen years of age when the offense was committed. She

did not stand in the relation of parent, master (mistress), or guardian to the principal offender, but — according to her own testimony — she rendered aid by carrying a bucket of water to the offenders, knowing what they were there for ; and we think that under the evidence she stands in the light of an accomplice.  To say the least, the instruction given by the judge took away from the jury the right to say whether she was or not.  The instruction upon this point, being at the close of the charge of the court, could by no possible means have escaped the attention of the jury, and thus the evidence of Lucinda Barras, the principal prosecuting witness, standing uncorroborated by a single witness, but squarely contradicted in several instances, is strengthened by the instruction of the judge.

Then, being an accomplice, she should be corroborated " by evidence showing that the accused was engaged in the transaction which forms the subject-matter of the charge under investigation." *Dill* v. *The State*, 1 Texas Ct. App. 287 ; *Irvin* v. *The State*, 1 Texas Ct. App. 301 ; *Kelly* v. *The State*, 1 Texas Ct. App. 637 ; Pasc. Dig., art. 3118 ; 1 Greenl. on Ev., sec. 381.  But it may be said that she is corroborated by her husband and Southerland ; and this brings us to the subject of confessions and admissions.  By a close investigation of Sampson Barras' evidence we have these words for the accused : "*Here is where Rat Morrow was shot.*"  And at another time he has it : " Here is where Rat Morrow lay when he was killed."  And Southerland says : "I asked defendant who it was."  He said, "*It was Rat Morrow.*"  Southerland asked him who did it, and he said, " *Me and Andy was two of the laverics.*"  The words italicized are all that we get as the language of the defendant. " With respect to all *verbal admissions*, it may be observed that they ought to be *received with great caution*.  The evidence, consisting as it does in the *mere repetition* of oral statements, is subject to much imperfection and mistake ;

the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally omitting a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say.

" But, when the admission is deliberately made and *precisely identified*, the evidence it affords is often of the most satisfactory nature." 1 Greenl. on Ev., secs. 200, 214. And if the confession implicates other persons by name, yet it must be proved *as it was made*, not omitting the names ; but the judge will instruct the jury that it is not evidence against any but the prisoner who made it. Greenl. on Ev., sec. 218, and note 1. "*Rex* v. *Hearne*, 4 Car. & P. 215 ; *Rex* v. *Clewes*, 4 Car. & P. 221, *per* Littledale, J., who said he had considered this point very much, and was of opinion that the names ought not to be left out. It may be added that the credit to be given to the confession may depend much on the probability that the persons named were likely to engage in such a transaction. See, also, *Rex* v. *Fletcher*, 4 Car. & P. 250. The point was decided in the same way." We insist that the whole confession should be taken together (1 Greenl. on Ev., sec. 218), *precisely* as it was made, before it is entitled to credit. Barras testifies " that such admissions were unusual with him, and that this was unexpected to him ; that he was not likely, from the attention he gave the matter, to forget any part of what was said ; that he was concerned enough to remember what was said ;" yet he is unable to give the exact language of the defendant in but a single instance, and then he has two expressions, and he can't remember whether he said " Bill Bell " was there or not, nor does he point out the place where the deceased was killed as being in Montague County. 22 Texas, 607. Southerland has sworn to what we have placed in italics as being the words of the accused, and from

his testimony these words were in direct answer to questions propounded by him to the accused; yet he closes his testimony by saying : " This statement was made to me by defendant before he was arrested, and was made freely and voluntarily, and not in answer to any question propounded by me to him ;" and he remembers distinctly that there were four men in it, and that the story made quite an impression on his mind, yet he cannot remember the two others named by the accused as being implicated with him.   He has never disclosed what he knew until almost the hour of trial, when he advertises himself as a witness ; yet he has known it for near eighteen months, and the defendant had made this important disclosure to him after having known him three months, and then he was going to church and trying to get witness to promise to go. Lucinda Barras, instead of being corroborated by her husband, Sampson Barras, and John Southerland, makes a fatal mistake in her testimony in chief.   She discloses the fact, on cross-examination, that she carried the water herself, and that Jesse Brown went with her and told her he would take the bucket back, and for her to go on over to his house and stay with the children ; and the reason why she did not state in chief that Jesse Brown went with her, she answered she " forgot it ; that she left Jesse Brown there with the boys." She is also squarely contradicted by her mother, Betty Brown, Adaline Brown, Nannie Hart, Mrs. Addington, and Mr. Packer in the material parts of her evidence, and, without the charge of the court before alluded to, the verdict might have been different.

The verdict of the jury is insufficient to support the judgment.   It does not even respond to the charge of the court. A verdict, " We, the jury, find the defendant guilty as charged in the indictment, and assess his punishment to be hung by the neck until dead," is insufficient to support a judgment.   *Buster* v. *The State*, 42 Texas, 315.   Paschal's Digest, page 2268, says the jury must find the degree.

We submit that reference cannot be had to the indictment, the facts, the charge of the court, nor the punishment assessed, to support the judgment, but that the verdict must be complete in itself, according to requirements of the statutes. See 31 Texas, 138 ; 42 Texas, 315 ; 24 Texas, 415.

*George McCormick,* Assistant Attorney General, for the State.

WHITE, J.     Appellant was indicted on November 1, 1873, in the District Court of Montague County, jointly with Andrew Brown, J. W. Bell, and Albert Harris, for the murder, in Montague County, of one R. S. Morrow, on September 5, A. D. 1873.     About a month before the case was first called for trial, the defendant, George Brown, this appellant, was arrested and placed in confinement in the county jail.

On October 30, 1876, a copy of the indictment was served upon him in jail, it being the day upon which the term of the District Court commenced.     A special *venire* was ordered the same day, made returnable on November 5, 1876.     On Friday, November 3d, the case was continued, upon the affidavit of the defendant, to enable him to obtain the testimony of Stephen Sullivan and G. P. Bell.

With regard to the next step in the order of proceedings had upon the trial the record is certainly contradictory. The transcript says that on November 6, 1876, came on to be heard a motion of the county attorney to set aside the continuance heretofore granted, which motion was sustained and the continuance set aside.; while defendant's second application for a continuance is shown to have been filed upon November 4th, and in his bill of exceptions saved to the overruling of the application he states that on Saturday, November 4th, the first continuance was set aside because of the indictment of the absent witness, Stephen Sullivan, for

this same murder. The motion of the county attorney, which should have been in writing, is not set out in the transcript; we will presume, however, that the bill of exceptions is correct, and that this motion was in fact filed and sustained on the 4th, instead of the 6th, of November.

The continuance having been set aside, defendant, on November 4, 1876, filed his application for a continuance for the want of the testimony of one David Lance, who resided in Lamar County, Texas, for whom an attachment had been issued and mailed to the sheriff of Lamar County, but which had not been returned.

This application for continuance was also overruled, and, on November 7th, defendant was placed upon trial, arraigned, and pleaded not guilty; was found guilty of murder in the first degree, and his punishment assessed at death.

The record in the case is very voluminous, and many questions are raised by the zealous counsel who have so ably defended the accused, under appointment of the court, on the trial below and on brief here. It is unnecessary, however, to attempt discussion of them all.

1. We are of opinion that the court erred in setting aside or refusing the continuance in the first instance, and that it was error in the next to overrule the subsequent application.

This court is not prepared to say that the inherent power which all courts have to control their orders, judgments, and decrees, during term time, would not carry with it the authority, under certain circumstances, to set aside a continuance granted in a criminal case, which is in the nature of an interlocutory order, without the consent of the defendant; but we apprehend the circumstances calling for the exercise of the power, and the reasons for the same, should be of a very strong and cogent character, and such as to show that the action had was without material preju-

dice or injury to the rights of the accused. Such practice has been of rare occurrence in this state. Only one instance reported in our decisions is remembered, the case of *Callahan* v. *The State*, 30 Texas, 488, wherein the court say : " The record shows that when the cause was called for trial, the witness for the state being absent, the defendant insisted upon a trial, but a continuance was granted with the express understanding that it should be set aside on the appearance of the witnesses. When this took place, therefore, the defendant, if his witnesses were not present, could have made a showing for a continuance if he had any cause, but he assigned no cause, and we see no error in the court ordering a trial."

The case of *McKay* v. *The State*, 12 Mo. 492, is almost analogous upon this point. Ryan, J., delivering the opinion, says : " Let us, for a moment, look at the facts as they appear on the record in this case. On the second day of the regular term of the court the counsel for the state moves the court to continue this case ; his motion prevails ; the case is continued until the next regular term. An order is made to have the defendant removed to the jail in St. Louis county, and the case, so far as it regards this term, appears at an end. On the fourth day of the term the counsel for the state moves the court to set aside the order of continuance and order remanding the prisoner to St. Louis jail. It appears that he notified defendant's counsel of his intended application for the setting aside ; the defendant's counsel objects ; but the court sustains the motion and sets aside the order of continuance, and fixes the trial for an adjourned term to commence on the 18th day of December following, and orders the defendant and his counsel to be notified thereof. From the record it is fair to presume that the defendant knew nothing of this order at the time ; that his witnesses had dispersed, left the court, when the case was continued on the second day of the term. Such a pro-

ceeding is too dangerous to the life and liberty of the citizen, and though it may sometimes happen without injury to the defendant, yet as a practice it should not be tolerated.'' In that case the continuance had been granted on account of the absence of the only witness for the state. Two days afterwards the witness arrived, and the motion to set aside was based upon the fact that this witness was in the last stage of consumption, and would not probably live to the next term. As stated above, a court may have the power to exercise such authority, but the power should be exercised only in such rare, exceptional cases as show most plainly no abuse of discretion and no material injury to the accused.

2. The subsequent application for continuance made on November 4th, which, under the circumstances as detailed above, we can consider in no other light than as a first application, was in compliance with the requirements of the statute (Pasc. Dig., arts. 2987, 2988), and should have been granted. *Dinkins* v. *The State*, 42 Texas, 250 ; *Skaro* v. *The State*, 43 Texas, 88 ; *Shackelford* v. *The State*, 43 Texas, 138. See, also, *Swofford and Marksbury* v. *The State*, *ante*, p. 76.

3. It is necessary that we should notice another question of practice suggested by one of defendant's bills of exception.

It seems that all the witnesses in the case had been placed under the rule, by order of the court, at the request of parties. One of the counsel of defendant obtained permission of the court to go into the room where they were kept and talk with the witnesses. Afterwards, when one of the state's witnesses had been examined, the attorney proposed to take the stand and impeach the testimony of the witness by swearing that in the interview had between them, whilst the witness was under the rule, he had made statements contradictory of his statements made from the wit-

ness stand. The court refused to admit the testimony, because the counsel had conversed with the witness by leave and permission of the court. In qualifying the bill of exceptions taken to this ruling, the district judge says : "It has been the uniform practice of the courts in this part of the state to permit the counsel privately to converse with state's witnesses so as to inform himself as to the testimony of the witness, * * * and the state's witnesses were usually admonished to talk freely with the defendant's counsel." This practice has, perhaps, grown out of a misconception of the decision of the Supreme Court in the case of *Williams* v. *The State*, 35 Texas, 365, but a reference to that case will not warrant the extent to which "the uniform practice," as stated by the court above, would necessarily lead. In that case, Walker, J., says : "Placing the state's witnesses under the rule will not deprive the district attorney of the right to confer with them in a proper manner ; this is his privilege, and, moreover, may be regarded as his duty. Nor is it any infraction of the law, breach of professional ethics, or cause of suspicion against the conduct of either the attorney or witness that counsel should freely confer with their own witness, both before and during the trial of any cause, civil or criminal."

The primary object of placing witnesses under the rule is that they may not hear the testimony of any other witness examined in the cause, and thereby to prevent them from concocting evidence in support of, or contradictory to, each other, and it is furthermore supposed to be one of the best modes yet devised for the preservation of truth and the detection of falsehood. Our statute provides that, "at the request of either party, the witnesses on both sides may be sworn and placed in the custody of an officer, and removed out of the court-room to some place where they cannot hear the testimony as delivered by any other witness

in the cause.    This is termed placing witnesses under the rule." Pasc. Dig., art. 3047.

" Art. 3048. When witnesses are placed under the rule, those summoned for the prosecution may be kept separate from those summoned for the defense, or they may all be kept together, as the court shall direct.

" Art. 3049. Witnesses, when under the rule, shall be attended by an officer and all their reasonable wants provided for, unless the court, in its discretion, directs that they be allowed to go at large."

" This separation of the witnesses is not a thing of absolute right to be demanded, for instance, by the prisoner; yet it is a matter pretty much of course to grant the motion for separation, whenever and by whichever party made. The order for the removal of witnesses from the court, being a matter within the discretion of the presiding judge, may be put in such form as to meet the particular demands of justice and convenience in the individual case.    If, for example, the assistance of some of the witnesses is required in conducting the prosecution or defense, these may be permitted to remain while the rest are excluded.    So the witnesses who are summoned as experts, and an attorney in the cause, and witnesses called to testify to the character for truth and veracity of a witness may all be permitted to remain in the court-room while the rest are sent away."    1 Bishop's Cr. Proc., secs. 1086, 1087 ; 1 Greenl. on Ev., sec. 442 ; *Roach* v. *The State*, 1 Texas, 262 ; *Goins* v. *The State*, 41 Texas, 344 ; *Sherwood* v. *The State*, 42 Texas, 498.

From the above authorities it will be perceived that the order of placing witnesses under the rule and the terms of the order are confided, in a great measure, to the sound discretion of the judge.    But, whilst this is so, we apprehend that discretion in no case should be exercised in such a man-

ner as would likely defeat the very object and purposes for which it is invoked; and a rule or "a uniform practice" which is likely to produce such results, it seems to us, would be "more honored in the breach than the observance." There are rare exceptional cases where it might be proper to permit attorneys to converse with their own witnesses who are under the rule, but this privilege, it seems to us, should be limited upon condition that the conversation be had and held in the presence and hearing of some officer of the court; in this way, we apprehend, the security of the rule may be protected and no injustice done. Besides, should a question of veracity arise subsequently, between counsel and the witness, the officer's testimony can be used in settling the matter.

It is the duty of attorneys to prepare and acquaint themselves with their cases by talking to the witnesses before the announcement for trial; and, if attorneys are appointed by the court to defend, it is the duty of the court to furnish them full opportunity and facility to converse with the witnesses, and make their necessary preparation before they are forced into trial; and this is especially the duty of the court in cases involving the grave issues of the life or liberty of the citizen.

The court, however, did not err in refusing to allow the attorney to attempt to impeach the state's witness by testifying to contradictory statements made to him whilst the witness was under the rule. It is, in the most imperative cases, a very delicate duty for an attorney to be compelled to offer himself as a witness in behalf of the cause he is advocating, and, in most cases, a position which should always rather be shunned than sought for, whenever it can possibly be avoided.

4. We are of opinion that the charge of the court is, to some extent, obnoxious to the criticism of counsel, in that

it is so framed in certain paragraphs that it appears to assume the guilt of the defendant, and was calculated to lead the jury to infer that such was the opinion of the court. Take the following portions of the charge, for instance. The court says :

" In this case, gentlemen, the court charges you *that the defendant is either guilty of murder in the first degree, or not guilty,* and, by reference to the foregoing definition of the crime of murder, *you will see that the defendant must have killed* the deceased with a sedate, deliberate mind, and formed design, and you are to judge from the circumstances attending the killing whether that state of mind did exist or not." And again : " To make the mind deliberate, *the accused must have reflected whether he would kill or not,*" etc.

To our minds these instructions, or rather the language in which they are clothed, are equally if indeed they are not more objectionable than a charge quoted in *Walker* v. *The State,* 42 Texas, 370, somewhat similar, and upon which the court say : " It is very different where the charge is so shaped as to take it for granted that the defendant is the person who did the act of shooting, when that is the only fact in controversy, as exhibited in the evidence. Being placed prominently in the conclusion of the principal charge, and being applied to this case directly in connection with such facts as would be sufficient to make the killing murder in the first degree by the defendant, none of which additional facts were in controversy at all, it was well calculated to injure the rights of the defendant." Pasc. Dig., art. 3137 ; *Searcy* v. *The State,* 1 Texas Ct. App. 440, and authorities there cited.

Upon another branch of the case the court further charged the jury that " a girl of tender years and immature mind, acting under the direction and command of those having authority over her, will not be an accomplice in the com-

mission of a crime, although in so acting she render assistance, aid, and comfort to the real author of the crime." Unless this instruction referred to the testimony of the state's witness, Mrs. Lucinda Barras, it is wholly inapplicable to any portion of the facts in this case. If it referred to the testimony of that witness, then the charge is incorrect in assuming that the witness was of such tender years and immature mind as to render her irresponsible in law for her actions as an accomplice to a murder, should the evidence otherwise establish that fact. This witness' own testimony is that she was some seventeen years old at the date when she testified, and that the facts about which she testified took place three years before; this would make the age of the witness fourteen years at the date of the transaction. Now, age is prescribed in our statute as follows:

" No person shall, in any case, be convicted of any offense committed before he was of the age of nine years; nor of any offense committed between the years of nine and thirteen, unless it shall appear by proof that he had discretion sufficient to understand the nature and illegality of the act constituting the offense." Pasc. Dig., art. 1638; *Wussing* v. *The State*, 33 Texas, 659.

5. The verdict in this case was not sufficient to warrant a judgment for murder in the first degree. The verdict reads as follows:

" We, the jury, find the defendant guilty, and assess his punishment at death."

The case of *Buster* v. *The State*, 42 Texas, 315, is directly in point. Our statute reads:

" If the jury shall find any person guilty of murder, they shall find by their verdict whether it is of the first or second degree." Pasc. Dig., art. 2268. " Unless the defendant is found guilty of murder in the first degree, the court cannot say that they have not assessed a penalty not war-

ranted." *Buster* v. *The State*, 42 Texas, 315 ; *Murray* v. *The State*, 1 Texas Ct. App. 430.

For the errors committed during the progress of the trial in the lower court, which have been herein discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*